**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                                    )
WASHINGTON TRUST ADVISORS, INC.,    )
                                    )
                Plaintiff,          )
                                    )
                                    )     Civil Action
v.                                  )     No. 22-11847-PBS
                                    )
SUSAN K. ARNOLD, RONALD D.          )
HALTERMAN, BRETT C. LONERGAN,       )
NICHOLAS T. ROSSI, PRIVATE ADVISOR  )
GROUP, LLC, and NORTHWARD           )
FINANCIAL GROUP,                    )
                                    )
                Defendants.         )
_____ )
```

**MEMORANDUM AND ORDER**

December 13, 2022

Saris, D.J.

**INTRODUCTION**

Plaintiff Washington Trust Advisors, Inc. ("Washington Trust") sued Susan K. Arnold, Ronald D. Halterman, Brett C. Lonergan, Nicholas T. Rossi (collectively, the "Individual Defendants"), Private Advisor Group, LLC ("PAG"), and Northward Financial Group ("Northward") alleging that the Defendants set up a competing investment advisory company in violation of the Individual Defendants' restrictive covenants. Washington Trust also claims that Defendants misappropriated their trade secrets. Before the Court is Washington Trust's motion for a temporary restraining order and a preliminary injunction. After hearing,

the Court **ALLOWS IN PART** and **DENIES IN PART** the motion.

**BACKGROUND**

The factual record, including affidavits and documentary evidence submitted by the parties, supports the following facts.

### I.    Factual Background

#### A.  Washington Trust

Washington Trust, formerly known as Weston Financial Corp., Inc. ("Weston"), is a Wellesley, Massachusetts-based registered investment advisor representing high-net worth individuals and businesses.  It is a subsidiary of Washington Trust Company, of Westerly, which acquired it in 2005.  Washington Trust's wealth advisors work with clients to implement their financial goals.

#### B.  Susan Arnold

Susan Arnold served as an investment advisor for Washington Trust since the 2005 acquisition.  On November 2, 2005, Arnold entered into an employment agreement with Washington Trust.  The agreement contained non-competition and non-solicitation covenants that would last during Arnold's employment and for 12 months thereafter.  The non-competition covenant provided that Arnold shall not:

> directly or indirectly, whether as owner, partner, shareholder, director, consultant, agent, employee, co-venturer or otherwise, engage, own, operate, participate or invest in any business or activity anywhere in Rhode Island, Connecticut, Massachusetts, New York, New Jersey, New Hampshire, Vermont, Maine, Minnesota, North Carolina, Pennsylvania, Florida or California that

> develops, markets, sells, offers or provides any
> products or services that are competitive with or
> similar to any products or services that are developed,
> marketed, sold, offered or provided by the Company or
> its subsidiaries or the other investment management
> businesses of Washington Trust.

Dkt. 5-2 ¶ 6(a).

Similarly, the non-solicitation covenant provided that Arnold

shall not:

> directly or indirectly, in any manner (i) call upon,
> solicit, accept, divert or take away any of the
> customers, clients, business partners, prospective
> customers, clients or business partners of the Company
> or Washington Trust, (ii) hire any employee or
> consultant of the Company or Washington Trust (or any
> person who was an employee or consultant of the Company
> or Washington Trust at any time during the six months
> prior to the expiration of the Employee's obligations
> under this Section 6) or solicit, entice or attempt to
> persuade any of those employees or consultants to leave
> the services of the Company or Washington Trust for any
> reason or (iii) disparage the Company or Washington
> Trust to any employee or consultant of the Company or
> Washington Trust or to any customer, client or business
> partner of the Company or Washington Trust.

Id. ¶ 6(b).

By its own terms, the agreement terminated on December 31,

2008, with a few provisions (not including the restrictive

covenants) surviving termination.

On August 15, 2018, Arnold and Washington Trust entered into

a letter agreement with a new compensation structure. The letter

agreement stated that "[a]s described in your Employment Agreement

with Weston dated November 2, 2005, the provisions of Section 6 of

that Agreement [regarding non-competition and non-solicitation]

remain in effect." Dkt. 5-3 at 2. The letter agreement then restated the two restrictive covenants.

### C. Ronald Halterman

Ronald Halterman started working at Weston in 2008 and began serving as an investment advisor in 2012. Halterman entered into an employment agreement with Washington Trust on August 14, 2018. As with Arnold, Halterman's agreement contained non-competition and non-solicitation covenants. The non-competition covenant stated:

> During your employment with Weston and for a period of six (6) weeks following the cessation of your employment in the event of your voluntary resignation, you will not, directly or indirectly, alone or as an owner, partner, officer, director, investor, consultant, employee, agent, joint venture, [lender or] stockholder of any entity, accept employment or engage in any business activity with any business or entity substantially similar to that of the Company or which is directly competitive with the Company within the geographic market area of the Company. For purposes of the foregoing, a business or entity is substantially similar to or directly competitive with the Company if such business or entity engages in wealth management and financial planning products and services. The geographic market area means Rhode Island, Connecticut, Massachusetts, New York, New Jersey, New Hampshire, Vermont, Maine, Minnesota, North California [sic], Pennsylvania, Florida and California.

Dkt. 5-4 ¶ 6(a).

The non-solicitation covenant provided:

> During your employment with Weston and for a period of twelve (12) months following the cessation of your employment for any reason, you will not, directly or indirectly: (i) recruit or otherwise solicit, induce or influence any person who is an employee of the Company

> to terminate their employment with the Company to become an employee of or otherwise be associated with you or any company or business with which you are or may become associated; or (ii) attempt in any manner to solicit or encourage any client, customer, supplier, or other business partner with whom the Company has had business contact or with whom you have personally had business contact any time during your employment with Weston to terminate or otherwise modify adversely its business relationship with the Company.

Id. ¶ 6(b).

Along with the six week term of the noncompete, Halterman's restrictive covenants differed from Arnold's in two other material ways.  First, his agreement stated that the restrictive covenants "are intended to remain in effect during and after your employment with Weston whether or not your duties change during your employment with Weston."  Id. ¶ 6.  Second, the agreement added that "the restrictive periods set forth herein will be tolled for any period during which you are in breach of this paragraph and will end only when the full term of the restrictive periods have run with no violation of your obligations."  Id.

### D.  Brett Lonergan

Brett Lonergan served as an investment advisor for Washington Trust for three years.  On February 12, 2019, Lonergan entered into an employment agreement with Washington Trust that included non-competition and non-solicitation covenants that were substantively the same as Halterman's.  Like Halterman, Lonergan's noncompete had a six-week term, his covenants were set to remain

in effect after termination of his employment regardless of whether his duties changed, and the covenants included a tolling provision.

### E.  Nicholas Rossi

Nicholas Rossi served as an investment advisor for Washington Trust beginning in 2018.  On June 25, 2018, Rossi entered into an employment agreement with Washington Trust.  Rossi's restrictive covenants were substantively identical to Halterman's and Lonergan's.

### F.  The Individual Defendants' Departures From Washington Trust

The Individual Defendants each became disaffected with Washington Trust management following a series of changes to staffing and compensation structure.  On Friday, September 23, 2022, they all submitted letters stating that they were resigning effective immediately and would be joining Northward, an affiliate of PAG based in Needham, Massachusetts.  Both Northward and PAG provide financial planning and wealth management services.

The Individual Defendants attest that they arrived at the decision to resign independently and did not solicit each other to leave Washington Trust.  They each returned property belonging to Washington Trust, including customer lists, pricing information, marketing materials, client identifying information, and customer files.  They also erased client contact information from their personal phones and inspected their text messages and social media

accounts for client-related information, deleting any they found.

Immediately after they resigned, the Individual Defendants used public databases like whitepages.com to obtain the contact information of former clients.  When they reached former clients over the phone, they used a prewritten script with the following language:

> a. This is <<Your Name>> calling. I am calling to let you know that as of _____, I resigned from Weston and have some new contact information. Please get a pen and paper so you can take this information down.

> b. My new contact information is (provide firm name, address, phone number, email address) – and encourage clients to write it down.

> c. When I left the firm, I did not take any of your information with me. Is it okay if I get your phone number, email address and home address?

> d. **Then PAUSE**. – Allow the client to drive the conversation from there and answer questions, if any, posed by the client. If no questions are posed, then politely end the call and your announcement is over. If the client re-initiates contact with you, you may answer any questions posed by the client at that time.

> ***If asked***, you may let them know you are able to transfer accounts for anyone who asks you to do so.

Dkt. 13-1 at 13; Dkt. 13-2 at 9; Dkt. 13-3 at 20; Dkt. 13-4 at 11.

The Individual Defendants insist that they only offered information when asked for it by former clients, and that, following the initial phone call, they did not speak with former clients who did not themselves initiate further contact.  When a client asked to continue working with one of the Individual

Defendants, the client signed a form attesting to their interest in continuing the relationship and that the decision was "in no way or manner" a result of "direct or indirect solicitation by" the Individual Defendant.  Dkt. 13-1 ¶ 28; Dkt. 13-3 ¶ 31; Dkt. 13-4 ¶ 18.

By Monday, September 26, 2022, Washington Trust began receiving phone calls from confused clients who had been contacted by the Individual Defendants.  Some of these clients reported that the Individual Defendants had solicited them to move their accounts over to Northward and PAG.  As of November 18, 2022, Washington Trust had received account transfer requests from 120 of the 368 clients the Individual Defendants had been assigned, representing a loss of $529,000,000 in assets under management.  A majority of these clients transferred their accounts to Northward.

## II.   **Procedural History**

Washington Trust promptly sent a cease and desist notice to Defendants.  The parties were unable to resolve their dispute, and Washington Trust filed a ten-count Complaint on October 28, 2022.[1]

---

[1]  The causes of action include Count I: Trade Secret Misappropriation in Violation of the Federal Defense of Trade Secrets Act (All Defendants); Count II: Misappropriation of Trade Secrets in Violation of Massachusetts General Laws Chapter 93, section 42 (All Defendants); Count III: Breach of Contract (Individual Defendants); Count IV: Breach of Implied Covenant of Good Faith and Fair Dealing (Individual Defendants); Count V: Breach of Fiduciary Duties (Individual Defendants); Count VI: Aiding and Abetting Breach of Fiduciary Duty (Northward and PAG); Count VII: Unjust Enrichment/Constructive Trust (All Defendants);

On the same day, Washington Trust filed the instant motion for a temporary restraining order and a preliminary injunction.

**DISCUSSION**

## I.      **Legal Standard**

The Court applies the same standard in assessing Washington Trust's requests for a temporary restraining order and for a preliminary injunction, see Orkin v. Albert, 557 F. Supp. 3d 252, 256 (D. Mass. 2021), bearing in mind that injunctive relief "is an extraordinary remedy never awarded as of right," Winter v. Nat. Res. Def. Council, Inc., 557 U.S. 7, 24 (2008).  The plaintiff must show "(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." NuVasive, Inc. v. Day, 954 F.3d 439, 443 (1st Cir. 2020) (quoting Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003)). While all four factors are relevant, likelihood of success is the "main bearing wall" of the preliminary injunction framework.  Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 10 (1st Cir. 2013) (citation

---

Count VIII: Unfair Trade Practices Under Massachusetts General Laws Chapter 93A (All Defendants); Count IX: Intentional Interference with Actual and Business Relations (All Defendants); and Count X: Intentional Interference with Contractual Relations (All Defendants).

omitted).

## II.  **Analysis**

### A. **Likelihood of Success**

#### *1.   Trade Secret Claims (Counts I-II)*

Washington Trust brings trade secret misappropriation claims under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, and the Massachusetts Uniform Trade Secrets Act, Mass. Gen. Laws ch. 93, § 42.   To prevail under both statutes, a plaintiff must establish "1) the information is a trade secret; 2) the plaintiff took reasonable steps to preserve the secrecy of the information; and 3) the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." Incase Inc. v. Timex Corp., 488 F.3d 46, 52 (1st Cir. 2007); see also Allscripts Healthcare, LLC v. DR/Decision Res., LLC, 386 F. Supp. 3d 89, 94-95 (D. Mass. 2019) (holding federal and state misappropriation of trade secret standards are equivalent).

On the record before the Court, Washington Trust is unlikely to be able to establish its trade secret misappropriation claim because it has not shown that any misappropriation took place. Misappropriation requires the acquisition or disclosure of a trade secret with knowledge that the trade secret was acquired by improper means.  See 18 U.S.C. § 1839(5); Mass. Gen. Laws ch. 93, § 42(2).  Washington Trust first argues that "Individual Defendants have stolen Washington Trust's Trade Secrets by a coordinated,

systematic program of client solicitation." Dkt. 3 at 12. This argument conflates Washington Trust's trade secret misappropriation and breach of contract claims. Washington Trust does not explain how client solicitation meets the statutory definition of trade secret misappropriation. Nor is the Court persuaded that the Individual Defendants may be liable simply because they retained information about Washington Trust clients in their memories; such information was not obtained through improper means. See 18 U.S.C. § 1839(6)(A) (defining "improper means" as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.").

Second, Washington Trust has not shown that the Individual Defendants took any trade secrets with them when they left for Northward. Washington Trust asserts that Halterman sent certain proprietary information to his personal email account both before and after his departure. Halterman vehemently denies this, and states that he returned or destroyed all of Washington Trust's confidential information in his possession before he resigned. At hearing, Halterman's counsel also represented that the documents at issue were public information that he forwarded to himself months before he resigned. Since Washington Trust has not submitted any additional evidence to bolster its assertion of trade secret misappropriation against Halterman, it has not demonstrated

that it is likely to prevail on its misappropriation claims on the merits.

> 2.  *Contract and Fiduciary Duty Claims (Counts III-VII)*

Washington Trust contends that the Individual Defendants breached their non-competition and non-solicitation covenants.[2] To establish a breach of contract claim under Massachusetts law, a plaintiff must establish that "(1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." Bose Corp. v. Ejaz, 732 F.3d 17, 21 (1st Cir. 2013) (citing Singarella v. City of Bos., 173 N.E.2d 290, 291 (Mass. 1961)).  Restrictive covenants are enforceable only if they are reasonable, meaning that they are "(1) necessary to protect a legitimate business interest, (2) reasonably limited in time and space, and (3) consonant with the public interest."  Automile Holdings, LLC v. McGovern, 136 N.E.3d 1207, 1218 (Mass. 2020).  While protection from ordinary competition is not a legitimate business interest, a restrictive covenant is enforceable if it protects a company's confidential information and goodwill.  See Boulanger v. Dunkin' Donuts Inc.,

---

[2] Defendants do not contest the merits of Washington Trust's claims for breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unjust enrichment (Counts IV-VII).  Any argument that these claims are unlikely to succeed on the merits is waived.

815 N.E.2d 572, 578 (Mass. 2004).

The Court finds that the restrictive covenants in the Individual Defendants' employment contracts with Washington Trust were generally reasonable.  Washington Trust has established that the restrictive covenants were necessary to protect the goodwill it has built with its clients.  The six-week and twelve-month restrictions in the covenants are within the range that Massachusetts courts have upheld.  See, e.g., All Stainless, Inc. v. Colby, 308 N.E.2d 481, 485-86 (Mass. 1974) (finding two year restrictive covenant of reasonable duration).

The Court will modify the noncompetes' geographic scope, however.  See id. at 486.  The record shows that while at Washington Trust, the Individual Defendants were based in Massachusetts and that, while their clients were interspersed throughout various states, they were largely concentrated in Massachusetts. Accordingly, the Court finds that the non-competition covenants are reasonable to the extent they restrict the Individual Defendants from competing within Massachusetts.

Defendants advance several arguments against the enforceability of the restrictive covenants.  First, they maintain that Arnold is not bound by her restrictive covenants because her employment agreement expired in 2008.  However, when she signed her 2018 letter agreement, she agreed to be bound by the original non-competition and non-solicitation covenants.  Arnold does not

dispute the 2018 agreement's validity or that she received consideration for signing it. The restrictive covenants bind Arnold.

Second, Defendants argue that the restrictive covenants are unenforceable under the material change doctrine, which provides that "a non-solicitation agreement or covenant not to compete may be deemed void if there are material changes in the employment relationship between an employee and the employer." NuVasive, 954 F.3d at 444 (internal quotation marks omitted). The material change doctrine generally applies when "an employee's employment relationship with the employer changes materially such that they have entered into a new employment relationship." Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 16 (1st Cir. 2009) (quoting Lycos, Inc. v. Jackson, No. 20043009, 2004 WL 2341335, at *3 (Mass. Super. Ct. Aug. 24, 2004)). The most common changes that may void restrictive covenants under the material change doctrine include pay cuts, demotions, or breaches of the employment contract. See Nuvasive, 954 F.3d at 445.

Here, the Individual Defendants have not shown that the terms of their employment materially changed since they each agreed to the operative restrictive covenants in 2018 or 2019. They decry certain modifications to their compensation structures, but these changes either (1) occurred at the same time as they agreed to the restrictive covenants, or (2) represented departures from their

subjective understanding of what their compensation would be, not departures from their employment agreements. For example, Lonergan stated that he was "under the impression that at a certain point, [he] would be offered a revenue share on the clients [he] worked on." Dkt. 13-2 ¶ 5. But he does not contend that this impression stemmed from any official communications from or agreements with Washington Trust. Nor do the Individual Defendants establish that their pay materially decreased after they entered into their employment agreements. Defendants have failed to establish that any of the changes they point to created a new employment relationship.

Third, Defendant's argument that Washington Trust's efforts to enforce the restrictive covenants contravene FINRA rules fails. Washington Trust avers that it is not a FINRA member, and Defendants have not shown otherwise.

Finally, Defendants argue that they did not actually solicit any Washington Trust clients, but rather that they simply informed clients that they had left Washington Trust to work at Northward. Massachusetts courts have held that when financial advisors merely provide notice to clients of their departure, they do not violate their non-solicitation covenants. See Fid. Brokerage Servs., LLC v. Callinan, No. 1884CV02098BLS1, 2019 WL 1576097, at *6 (Mass. Super. Ct. Feb. 11, 2019) (citing Getman v. USI Holdings Corp., No. 05-3286-BLS2, 2005 WL 2183159, at *4 (Mass. Super. Ct. Sept.

1, 2005); BNY Mellon, N.A. v. Schauer, No. 201001344BLS1, 2010 WL
3326965, at *9 (Mass. Super. Ct. May 14, 2010).

In cases like this one where financial advisors conduct
outreach to former clients, courts have looked to several factors
in determining whether the line has been crossed between routine
notice and subtle solicitation.  These factors include whether the
advisor invites clients to take the initiative to transfer their
accounts or otherwise suggests that the advisory relationship can
continue.  See Am. Express Fin. Advisors Inc. v. Walker, No. CIV.A.
98-01673, 1998 WL 754620, at *8 (Mass. Super Ct. Oct. 28, 1998).
Also critical are whether and by what means the advisor initiates
contact with former clients, the duration of the outreach, and the
degree of interest a former client would need to show before the
advisor begins encouraging them to transfer accounts.  See
Callinan, 2019 WL 1576097, at *7.  In Callinan, the court reviewed
these factors and determined that an advisor's client calls "were
effectively solicitations wrapped in the thin veneer of an
announcement."  Id.

The same is true here.  The Individual Defendants
affirmatively called their former clients.  The script they used
encouraged clients to write down the Individual Defendants'
contact information and used a calculated pause designed to elicit
questions which could then lead to active solicitation.  Washington
Trust's affiant stated that clients reported being solicited to

move their accounts during these phone calls.  Accordingly, the Court finds that Washington Trust is likely to succeed on the merits of its claims for breach of the restrictive covenants.

    *3.   Tort Claims (Counts VIII–X)*

Defendants do not address the likelihood of success of Washington Trust's Chapter 93A, intentional interference with actual and business relations, and intentional interference with contractual relations claims.  Accordingly, the Court proceeds to the remaining preliminary injunction factors.

**B.  Irreparable Harm**

Irreparable harm is "an essential prerequisite for a grant of injunctive relief."  <u>Ross-Simons of Warwick, Inc. v. Baccarat, Inc.</u>, 217 F.3d 8, 13 (1st Cir. 2000).  A plaintiff must show that it does not have an adequate remedy at law.  <u>See</u> <u>Rosario-Urdaz v. Rivera-Hernandez</u>, 350 F.3d 219, 221 (1st Cir. 2003).  Further, "[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store."  <u>Charlesbank Equity Fund II v. Blinds To Go, Inc.</u>, 370 F.3d 151, 162 (1st Cir. 2004).

Washington Trust's strongest argument that it has demonstrated irreparable harm relies upon the Individual Defendants' employment agreements.  Arnold's agreement provided:

> The Employee recognizes that the Company's remedy at law
> for any breach of the provisions of this Employment
> Agreement, including [the restrictive covenants], would

> be inadequate and that, in the case of such a breach by the Employee, the Company will, in addition to such other remedies as may be available to it at law or in equity or under this Employment Agreement, be entitled to injunctive relief and to enforce its respective rights by an action for specific performance to the extent permitted by law.

Dkt. 5-2 ¶ 11.

Similarly, Halterman, Lonergan, and Rossi's agreements stated, in relevant part,

> You agree that any breach or threatened breach of this Agreement will cause the Company substantial and irrevocable damage that is difficult to measure. Therefore, in the event of any such breach or threatened breach, you agree that the Company, in addition to such other remedies that may be available, shall have the right to seek specific performance and injunctive relief without posting a bond.  You hereby waive the adequacy of a remedy at law as a defense to such relief.

Dkt. 5-4 ¶ 8; Dkt. 5-6 ¶ 8; Dkt. 5-7 ¶ 8.

Massachusetts courts, including this Court, have generally enforced these "irreparable harm clauses," and Defendants do not submit any case law to the contrary. See Tuckerbrook Alt. Invs., LP v. Banerjee, No. 08-cv-10636-PBS, 2008 WL 2356349, at *4 (D. Mass. June 4, 2008); Borden & Remington Corp. v. Banisch, No. A9901270, 1999 WL 1266161, at *5 (Mass. Super. Ct. Oct. 18, 1999). Washington Trust has thus established irreparable harm as to Halterman, Lonergan, and Rossi.

The same cannot be said of Arnold, however.  As noted, Arnold's employment agreement expired in 2008. Nothing in Arnold's irreparable harm clause suggests that it survived expiration of

the employment agreement, nor did Arnold's 2018 letter agreement include a similar provision.  Moreover, Washington Trust has failed to otherwise demonstrate that it will suffer irreparable harm from Arnold's violations of the employment agreement.  The Court agrees with Defendants that "the financial services industry is uniquely skilled at computing the economic value of a given client." Bear, Stearns & Co. v. Sharon, 550 F. Supp. 2d 174, 178 (D. Mass. 2008). Washington Trust has itself submitted evidence suggesting that its harm arising from the Defendants' activities is quantifiable.  See Second Suppl. Aff. of Kathleen A. Ryan, Dkt. 35 ¶ 9 (stating that Washington Trust had received account transfer requests representing $529,000,000 in assets under management from former clients of the Individual Defendants).  As to Arnold, then, Washington Trust has an adequate remedy at law precluding a finding of irreparable harm.[3]

## C. Balance of Hardships

In weighing the enforceability of restrictive covenants, "the reasonable needs of the former employer for protection against harmful conduct of the former employee must be weighed against both the reasonableness of the restraint imposed on the former employee and the public interest." All Stainless, 308 N.E.2d at

---

[3] Because Washington Trust has not produced evidence of trade secret misappropriation, it cannot establish irreparable harm arising from its trade secret claims.

485.   Other courts have noted a conundrum in balancing the harms in the context of restrictive covenants: the employer is entitled to protect its own goodwill, but where a financial advisor develops a relationship of trust with clients under the umbrella of a financial advisory company, "the company's goodwill and the employee's goodwill are inevitably intertwined." Smith Barney Div. of Citigroup Glob. Mkts. Inc. v. Griffin, No. 08-0022-BLS1, 2008 WL 325269, at *4 (Mass. Super. Ct. Jan. 23, 2008).

The potential harm to Washington Trust is loss of its own goodwill.  The countervailing harm to the Individual Defendants is the temporary loss of their ability to earn a living.  Here, the Court concludes that the harm to Defendants outweighs the harm to Washington Trust with regard to the Individual Defendants' pre-existing clients who transferred their accounts to Northward and PAG.  The Individual Defendants developed substantial goodwill of their own with those clients who chose to transfer with their financial advisors, and those clients would themselves be harmed if they were unable to work with their chosen advisors for weeks or months.  In contrast, the harm to Washington Trust from loss of goodwill outweighs the harm to Defendants pertaining to any clients of Washington Trust who did not work with the Individual Defendants or did not choose to transfer.

### D. Public Interest

Similarly, the public interest counsels in favor of limited

injunctive relief.  The Court must be careful not to "punish[] the clients of the departing financial advisors, many of whom have relied upon the advice of their financial advisor for many years in deciding how to invest their life savings." Smith Barney, 2008 WL 325269, at *3.  A complete ban on Defendants' ability to advise the clients who have already transferred their accounts would leave those clients without advisors to service their savings for an extended period.  Nonetheless, the public interest favors enforcement of the agreed-upon restrictive covenants as applied to any potential clients who are not current customers of Defendants.

### E.  Conclusion

Washington Trust has established a likelihood of success on the merits on its contract and tort claims arising from Defendants' competition with Washington Trust and solicitation of Washington Trust clients.  It has failed, however, to show that it will likely prevail on its trade secret misappropriation claims.  Washington Trust is likely to be irreparably harmed by Defendants' violations of the non-competition and non-solicitation covenants, except for breaches by Arnold.  The equities and the public interest weigh in favor of injunctive relief that preserves Defendants' existing client relationships but prohibits any further competition with Washington Trust during the restrictive period.

### ORDER

Washington Trust's motion for a temporary restraining order

and a preliminary injunction (Dkt. 2) is **ALLOWED IN PART** and **DENIED IN PART**.   The motion is denied as to Arnold and is denied with respect to Washington Trust's trade secret misappropriation claims.   With regard to the remaining Defendants and all claims arising from Defendants' competition with Washington Trust and solicitation of its clients, the Court orders as follows:

- For a period of six weeks following entry of this Order, Defendants Halterman, Lonergan, Rossi, Northward, and PAG are enjoined from violations of the Individual Defendants' non-competition covenants with Washington Trust in the Commonwealth of Massachusetts, provided that Defendants may continue to service their existing clients.

- For a period of twelve months following entry of this Order, Defendants Halterman, Lonergan, Rossi, Northward, and PAG are enjoined from violations of the Individual Defendants' non-solicitation covenants with Washington Trust.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge